IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020

**STATE OF TENNESSEE v. JEFFREY MANSIR**

**Appeal from the Circuit Court for Blount County**
**No. C-23193 Tammy M. Harrington, Judge**

_____

**No. E2019-01419-CCA-R3-CD**

_____

The Defendant-Appellant, Jeffrey Mansir, was convicted by a Blount County jury of kidnapping, in violation of Tennessee Code Annotated section 39-13-303, and assault, in violation of Tennessee Code Annotated section 39-13-101.[1] He was sentenced as a Range II multiple offender to ten years' imprisonment, to be served consecutively to a Knox County conviction. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the evidence is sufficient to sustain the Defendant's conviction for kidnapping; (2) whether the trial court erred in denying the Defendant's request for a mistrial following an improper comment by the victim; and (3) whether the trial court erred in sentencing the Defendant as a Range II offender based on a prior out of state felony conviction. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the Defendant-Appellant, Jeffrey Mansir.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Mike L. Flynn, District Attorney General; and Tiffany Smith, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On October 17, 2014, the night of the victim's birthday, the victim and the Defendant, who was her boyfriend at the time, got into a verbal argument which quickly

_____

[1] The Defendant was initially indicted by Blount County grand jury of aggravated kidnapping, aggravated assault by strangulation, and reckless aggravated assault.

escalated and turned physical. The victim alleged that the Defendant struck her multiple times in the face and body, strangled her, hit her in the head with a motorcycle helmet, and confined her in her bedroom overnight, refusing to allow her to leave until the next morning. The victim did not call the police or go to the doctor until over a week later because she was scared of what the Defendant would do to her if she told someone what happened. The Defendant admitted that he hit the victim, but he argued that this amounted to a domestic assault instead of aggravated assault. He denied strangling the victim or confining her to her bedroom and refusing to allow her to leave. The following proof was adduced at the Defendant's trial, which took place from April 18-20, 2018.

The victim, the sole witness for the State, was thirty-seven years of age and a registered nurse at the time of the Defendant's trial. She testified that, in October 2014, she lived in Maryville, Tennessee with her nine-year-old son and the Defendant, who was her boyfriend at that time. She and the Defendant had been in a relationship for one year and ten months at that time, but they were "in the process of breaking up." On the victim's birthday, October 17, 2014, she went to lunch with a friend, got her nails done, met with the Defendant's mother, and met her friends at a bar for drinks. The victim was at the bar for several hours, during which she estimated that she had "between four and six beers, three to four shots throughout the course of the evening." Although the Defendant was not initially invited to the bar, he eventually showed up after the victim invited him. He arrived at the bar around 11:30 p.m., and he left with the victim in his car around 1:30 a.m.

When they arrived home, the Defendant and the victim began kissing and things "progressed back towards the bedroom[,]" at which time the Defendant made a comment about the victim's "being unfaithful." The victim became offended at this comment, and she and the Defendant stopped kissing. The Defendant got dressed and left the master bedroom, and the victim wrapped a blanket around her and followed the Defendant into the kitchen/living room. The Defendant began making eggs, and the victim asked the Defendant "why he always wanted to argue and say things like that when he knew they weren't true." The victim went into the spare bedroom, and she received a text message from her male friend asking if she had arrived home safely. The Defendant asked the victim if this text was a "booty call," she told him that it was not, and the Defendant "snatched the phone out of [the victim's] hand and started scrolling through [her] text messages and reading some of them out loud." The Defendant became "extremely angry," called the victim a "dirty w---e," and asked her what else she was hiding. The Defendant began walking back towards the kitchen, and the victim followed him, trying to grab her phone. The Defendant then pushed the victim down, and she landed on her hip. The victim described herself as 5' 4", 120 pounds and the Defendant as 6' 3" to 6' 4", 240 pounds at that time.

The victim "jumped up and ran around the couch," and the Defendant continued to call the victim a "w---e and dumb b--ch and various colorful words." She called the

Defendant an "a--hole" and a "liar," and she threw three candles at the Defendant "hoping that maybe if something made impact that he wouldn't be able to get [her]." The victim said that the candles did not hit the Defendant, but they hit the wall and shattered, which "[further] [enraged]" the Defendant. The victim ran towards the spare bedroom, something hit her from behind and she stumbled, and she got up and ran into the bedroom. She then threw a glass over her shoulder at the Defendant, but she was not sure if the glass hit the Defendant. The Defendant then started hitting the victim in the face and the head, most of which were to the left side of her face. The victim pleaded with the Defendant to stop, but the Defendant continued. The victim fell to the floor, while the Defendant continued to hit her in the arms and the sides.

The victim stated that the next thing that she remembered was being on the bed, and the Defendant put his hands around her neck and started choking her. The Defendant told the victim, "[Y]ou're never going to see your son again, you f---ing c--t." The victim was not sure how long the Defendant was choking her, but she lost consciousness. When she woke up, the Defendant was "pretending to call 9-1-1[,]" and he told the victim that she did not deserve him and that she was ungrateful. She began apologizing and crying, and the Defendant picked up a motorcycle helmet that he had bought for her and threw it at her, striking her on the side of the head. The victim said that it felt like she "got hit with a brick[,]" and she started feeling very sick. The Defendant picked up the helmet and threw it at the victim again, but it "missed and it bounced and hit the bed and the wall behind [the victim] and it put a hole in the wall." The victim identified a photograph of the motorcycle helmet[2], which had "white flecks" on it because of "paint transfer from the wall." She also identified a photograph showing a hole in the wall where the helmet struck.

The victim said that things got a "little fuzzy" at that point, and she believed that she had a concussion based on her nausea, dizziness, and blurred vision, and based this on her experience as a registered nurse. After this, the victim began apologizing to the Defendant. She told him that she had to use the bathroom, and he told her "to piss in the floor, you c--t." She asked the Defendant if she could lay back down on the bed, but she could not remember what he said. Her next memory was of the Defendant's telling her, "[W]e're going to go lay down together, you're not laying in here by yourself, there's no way, because you'll call the police. You know what happens if I go back to jail. I will kill you before I go back to jail." The Defendant and the victim then exited the spare bedroom, and the Defendant let the victim use the bathroom, where she dry-heaved. The Defendant then told the victim that they were going to the master bedroom, and, once they were inside the room, the Defendant closed the door and put a mirror in front of the door. The victim said that the mirror was about six feet tall, "very large," "very heavy," and "it takes two grown men to move it." The victim identified a picture of the mirror. She said that her

---

[2] We note that none of the exhibits entered at trial were included in the record on appeal.

bedroom door opened into the room and that there was no way for her to get out of the bedroom with the mirror in front of the door.

The Defendant started hitting the victim again, and she started "praying out loud, " which prompted him to stop hitting her.  The Defendant let the victim get back on the bed, and he "started having sex with [her][,]" which she said she did not want to do.  She asked the Defendant to stop, which he did, and he called her a "dirty w---e who could spread [her] legs for everyone but him."  The Defendant then turned the light off and laid down beside the victim, while she sat upright because of her concussion.  The Defendant told the victim to stay in bed.  She stated that she began thinking about how she "had no clothes, no phone, and [she] didn't know how [she] was going to get out of that room or if [she] was going to get out of that room."  The victim attempted to get up when the Defendant became still, but he told her to "stay still."

The next morning, the victim told the Defendant that she was very thirsty and needed to take something for her head, so the Defendant moved the mirror and let her go to the kitchen.  The Defendant followed the victim into the kitchen, but he eventually went back into the bedroom.  The victim attempted to find a "burner phone" that was somewhere in her house without "raising any kind of suspicion" with the Defendant.  She eventually found the phone and tried to call her mother, but she did not answer.  The victim said that she did not call the police because she "absolutely believed that [the Defendant] would kill [her] if [she] didn't do as he had asked[,]" and she did not leave because she did not have her keys or her car and she did not want her neighbors to call the police.

The victim called the Defendant's mother and told her that the Defendant had hurt her and she needed to get out of the house, and the Defendant's mother and stepfather picked her up and took her back to their house.  The victim took a photograph of her face, which the State introduced to the jury, and she explained that she had an "awful" headache, her cheek was swollen and sore, and her limbs ached.  The victim said that she did not go to the hospital because "[the Defendant] told [her] that he would kill [her] if [she] told on him."  The victim stayed with the Defendant's mother for a few days, during which time she took several photographs of herself, which were entered into evidence.  At some point while she was staying with the Defendant's mother, the victim received a text message from the Defendant with a photograph of the side of the Defendant's face attached.  The Defendant told the victim that the injury to his face was from her throwing the glass at him.

On the weekend after the victim returned home, her son's father and his girlfriend came to her house in the middle of the night and "started panicking" when they saw her face.  She explained that she was not wearing makeup at that point, and, until that time, no one else had seen the injuries to her face.  The victim said that her son's father was "so alarmed by how it looked and by the fact that [she] hadn't contacted the police."  Several friends showed up to her house, one of whom called the police, and the victim told an

officer what happened with the Defendant. The officer took photographs of the victim's face, and these were entered into evidence. The victim also filed an order of protection against the Defendant. A few days later, the victim sought medical treatment, and she explained that she had been assaulted and was still having headaches, nausea, dizziness, and blurred vision. She had an MRI and was diagnosed with a concussion. She stated that her doctors also "made reference to a hairline fracture that was found on the odontoid process, which is the neck, of her C2 vertebra." The victim's medical records were entered into evidence.

On cross-examination, the victim confirmed that she gave a statement to an officer and that she had seen a copy of his report. She stated that, although the officer wrote that the Defendant "slammed [the victim's] head into a wall" and threw the victim against the "top support of the couch," she did not tell him these things and the officer "paraphrased quite a bit." Defense counsel provided the victim with a copy of the officer's report, and she confirmed that the report did not mention that she was held against her will, strangled, raped, or hit with a helmet. The victim also stated that she was "forthcoming and accurate" with what she told her doctors. She said that she told her doctors that she was involved in an assault but not that she was strangled, raped, or kidnapped. She confirmed that the doctor's report did not indicate any injury to her nose, mouth, or throat, but it did indicate bruising to her left abdomen and face. The victim's physical examination revealed that her neck was "non-tender to palpitation" and that she had "a range of movement without pain[,]" but she stated that her neck was not sore at that time.

Defense counsel questioned the victim extensively about the injuries to her head. The first report, which was entered on October 28, 2014, indicated that the victim had post-concussive syndrome and was based on what the victim told her doctors of her symptoms and not on any kind of testing. She explained that her eye test results were abnormal, so doctors referred her to have an MRI done. The victim identified the report from her MRI, which indicated that she had a head injury. She affirmed that the report did not use the word "concussion." Defense counsel questioned the victim about the "findings" and "impressions" indicated on the report, all of which came back normal. The victim affirmed that she had a hairline fracture on her neck; however, she and defense counsel argued back and forth on whether this was indicated on her report. She confirmed that none of her medical documents used the words "hairline fracture," but she insisted that the tests indicated an abnormality.

The victim confirmed that her relationship with the Defendant had been very tense prior to this incident, and they had each accused each other of infidelity. The victim affirmed that, on the day of the incident, she had a margarita, a shot, and a beer in the afternoon, as well as five to seven beers and two shots at the bar that night, and she had a "very healthy buzz." However, the victim stated that she was not "so drunk" that she had memory loss about the events that happened that night.

Defense counsel introduced a video that the Defendant took of the victim that night and questioned her about several aspects of it. The victim agreed that she did not remember being videotaped and, prior to seeing the video, she had never previously described the events depicted on it. She said that she had not previously realized that she had memory loss prior to watching the video. The victim stated that the Defendant came into the spare room, and she sounded "confused," "slurred," and "garbled." The Defendant asked the victim why she threw candles at him, and she said, "Because you wouldn't give me my phone." The victim could not remember when the video was made in the chain of events that night. She affirmed that the Defendant's motorcycle helmet was in the spare bedroom and that he threw it at her, although she could not remember whether he actually threw it or "held it in his hand and struck [her] with it." She disagreed that she "described the assault differently when [she] testified [previously] than [she] did [at trial]." She also disagreed that, on the video, the Defendant left her in the spare bedroom and turned off the light as he exited the room.

The victim said that her son's father came to check on her to "make sure that [the Defendant] hadn't come home angry" because he ran into the Defendant at a strip club, and they got into an argument. She agreed that, shortly after this, she sent the Defendant a text message saying, "As a matter of fact, you scumbag motherf--ker, don't ever step foot back in my house. You have f--ked yourself." On redirect examination, the victim stated that her medical records indicated that she had a concussion. The victim read the statement that she gave when she filed the order of protection against the Defendant, as well as her preliminary hearing testimony, into evidence. She stated that this testimony was "substantially similar" to what she had said at trial. On recross-examination, the victim agreed that, although she said in her prior statements that the Defendant never left her alone in the spare bedroom, the video showed that she was left alone in that room. She agreed that she was given information prior to trial to refresh her memory on the events of that night. Following the victim's testimony, the State rested. The Defendant did not present proof on his behalf.

Following deliberations, the jury convicted the Defendant of the lesser included offenses of kidnapping and assault. He was subsequently sentenced, as a Range II offender, to a concurrent term of ten years' imprisonment for his kidnapping conviction, and eleven months and twenty-nine days for the assault, which was to be served consecutively to another, unrelated Knox County conviction. On July 3, 2019, the trial court conducted a hearing on the Defendant's motion for new trial, which was subsequently denied. The Defendant filed a timely notice of appeal, and his case is now properly before this court for our review.

## ANALYSIS

**I. Sufficiency of the Evidence.** First, the Defendant argues that the evidence is insufficient to support his conviction for kidnapping.[3] He asserts that there was insufficient evidence to establish that he confined the victim and that the only "evidence of physical confinement beyond the assault and threats" was that the Defendant placed a large mirror in front of the bedroom door and told the victim to stay in the bed. However, he states, "[The victim] did not say that she was physically unable to move the mirror away from the door, or that she attempted to leave the room and was physically restrained from doing so." The State responds that the evidence is sufficient to support the Defendant's kidnapping conviction, asserting, "the evidence showed that the [D]efendant moved the victim into their bedroom and refused to allow her to leave the room or the apartment." We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are

---

[3] The Defendant does not challenge the sufficiency of the evidence surrounding his conviction for assault.

consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant here, "Kidnapping is false imprisonment as defined in [Tenn. Code Ann.] 39-13-302, under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). "Because it serves a building block for Tennessee's kidnapping statutes, false imprisonment is meant to 'broadly address[ ] any situation where there is an interference with another's liberty.'" State v. Carey, No. M2013-02483-CCA-R3-CD, 2015 WL 1119454, at *9 (Tenn. Crim. App. Mar. 10, 2015) (citing Tenn. Code Ann. § 39-13-302(a), Sentencing Comm'n Cmts.; State v. White, 362 S.W.3d 559, 574–75 (Tenn.2012)).

Viewing the evidence in the light most favorable to the State, the Defendant and the victim were engaged in a heated argument, during which the victim threw several glass objects at the Defendant, and the Defendant struck the victim multiple times in the head and face. The victim testified that the Defendant strangled her until she lost consciousness and hit her on the side of the head with a motorcycle helmet, giving her a concussion. The Defendant would not let the victim use the bathroom, and he told her, "[W]e're going to go lay down together, you're not laying in here by yourself, there's no way, because you'll call the police. You know what happens if I go back to jail. I will kill you before I go back to jail." The Defendant and the victim then went into the master bedroom and the Defendant put a mirror, which the victim described as "very large" and "very heavy," in front of the door, blocking her exit from the room. The Defendant began hitting the victim again, tried to have sex with her, and eventually turned the lights off in the room and laid down next to the victim. She tried to get up during the night, and the Defendant told her to stay in bed and "stay still." The victim stated that she was not able to exit the room until the next morning when the Defendant moved the mirror from the doorway and allowed her to go into the kitchen. The victim stated several times that she "believed that [the Defendant] would kill [her] if [she] didn't do as he had asked."

Although the Defendant essentially argues that the victim was not confined because she did not say that she was unable to move the mirror or that the Defendant physically restrained her from leaving the bedroom, the jury heard the victim's testimony, and, by its verdict, accredited her testimony, as was its prerogative. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008); State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The evidence shows that the Defendant had already physically harmed the victim by the time they went into the master bedroom, and she was afraid that he would further harm her or kill her if

she attempted to leave the room that night. Therefore, the evidence is sufficient to sustain the Defendant's conviction for kidnapping. He is not entitled to relief on this issue.

**II. 404(b)/Motion for Mistrial.** Next, the Defendant asserts that the trial court erred in denying his request for a mistrial after the victim referenced a statement made by the Defendant about "going 'back' to jail" during her testimony. While he acknowledges that this statement "could [have] assist[ed] [the jury] in evaluating the [Defendant's] reasoning for his actions at the time[,]" he asserts that the victim's use of the phrase "back to jail" was evidence of a prior bad act, and "may have left the jury speculating about what misdeeds may have led to his prior incarceration." The State responds that the Defendant failed to establish manifest necessity for a mistrial, and, as such, the trial court did not abuse its discretion in denying his request. The State asserts that the trial court followed the proper procedure under Tennessee Rule of Evidence 404(b), that the victim was instructed by the State not to mention anything about the Defendant going back to jail, that the trial court properly held that the statement established the Defendant's motive for committing the crime, and that it was not unduly prejudicial under Tennessee Rule of Evidence 403. We agree with the State.

On June 9, 2017, the trial court held a hearing on the State's 404(b) motion seeking to admit the following statement that the victim testified was made by the Defendant while he was assaulting her: "Look at your face. This is ten times worse than what I did to Nicole. Look how much trouble I got in for that. If I had a gun right now, I'd blow your brains out and mine." Defense counsel requested a clarification on what exactly the State was seeking to introduce based on its pre-trial motion,[4] and the State asserted that it was seeking to introduce the Defendant's statement and his Knox County conviction for aggravated assault. The trial court reserved its ruling on the issue and held that its ruling would depend on the testimony that came out at trial.

During her testimony at trial, the victim made the following statement:

> He let me get up and he said we're going to go – we're going to go lay down together, you're not laying in here by yourself, there's no way, because you'll call the police. You know what happens if I go back to jail. I will kill you before I go back to jail.

The Defendant requested a bench conference, and the State told the trial court that the victim had been instructed not to say anything about the Defendant going back to jail. The

---

[4] The State's 404(b) motion, and all of the pre-trial pleadings for that matter, are not included in the record on appeal.

trial court then held a jury out hearing, during which the Defendant argued that the trial court's 404(b) ruling up until that point would not allow that testimony into evidence, and he requested a mistrial. The trial court expressed reservations on whether the statement was prohibited under its ruling until that point, and the Defendant asserted that the statement was evidence of a prior bad act and required a 404(b) hearing outside of the presence of the jury before being admitted. The State informed the trial court that the statement was proffered at the preliminary hearing, and the trial court held as follows on the issue:

> And in these situations, you have a witness on the stand who is being asked questions on direct examination, which are open[-]ended questions where either side is asking a witness to tell their story. And quite frankly that was the next thing that happened in the story, in the sequence of events, and it was a statement made by the Defendant, made in conjunction with a statement -- and once again I'm paraphrasing -- about [the victim] -- about why going to the master bedroom, why staying with [her], et cetera. And once again I find that it is the Defendant's words, it goes to motive, it goes to intent. I don't find that the way that this testimony was presented at this point was unfairly prejudicial. I don't find any wrongdoing on behalf of the State. You're not alleging any wrongdoing on behalf of the state.
>
> . . .
>
> And I appreciate that, because under these circumstances that would be an unnecessary trail to go down, I believe, under the way that this was presented and [the prosecutor's] reaction. So, at this point, I am going to deny your request for a mistrial. However, you have it preserved now for the record. Okay?

The trial court also instructed the State to tell the witness to refrain from making any further statements about the Defendant returning to jail. The trial court held that the statement was made unintentionally and was not in violation of her previous 404(b) rulings.

The decision to grant or deny a mistrial rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004). A trial court should declare a mistrial "only upon a showing of manifest necessity." Robinson, 146 S.W.3d at 494 (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34

S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "'The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, 341-42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The party seeking a mistrial has the burden of establishing the necessity for a mistrial. Reid, 164 S.W.3d at 342 (citing Williams, 929 S.W.2d at 388). In determining whether a trial court abused its discretion in granting or denying a mistrial, this court should consider the following factors: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007) (citing State v. Lawrence Taylor, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *10 (Tenn. Crim. App. Feb. 14, 2003)).

Evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Tennessee Rule of Evidemce 404(b). Rule 404(b) states:

> **Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the

accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with the rule's requirements, the court's ruling will not be overturned absent an abuse of discretion. Id. (citing State v. Kiser, 284 S.W.3d 227, 288-89 (Tenn. 2009); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The record reflects that the victim stated the comment in question, that the Defendant said he would kill her before he returned to jail, inadvertently in narrative form in response to an open-ended question by the State. Under these circumstances, the trial court was obviously unable to comply with the requirements of Rule 404(b); therefore, our standard of review is de novo. Upon our review, we nevertheless agree with the trial court and conclude that the Defendant's statement was probative of his motive and intent to commit the kidnapping of the victim to keep her from telling anyone about the assault. Although the trial court did not explicitly state that proof of other crimes, wrongs, or acts was "clear and convincing," the record established that the Defendant had previously been incarcerated and had a Knox County conviction for the aggravated assault of another woman. The trial court determined, and we agree, that the statement was not unduly prejudicial to the Defendant.

We also conclude that the trial court did not abuse its discretion in denying the Defendant's request for a mistrial. First, the trial court determined that the State did not elicit the foregoing statement from the Defendant; instead, the victim made the statement in the course of "tell[ing] [her] story." See State v. Nash, 294 S.W.3d 541, 547 (Tenn. 2009) (holding that the State did not elicit the inappropriate testimony from the witness concerning the defendant's prior DUI convictions and that this was a "'spontaneous statement' that was made during 'unrelated questioning by the trial court.'"); State v. Smith, 893 S.W.2d 908, 923 (Tenn. 1994) (considering an inappropriate statement by a witness concerning the defendant's previous incarceration and concluding that such a statement was "unresponsive and unsolicited" and did not warrant a mistrial.)

Additionally, the Defendant agreed at trial that the State did not commit any wrongdoing. Next, although the trial court did not issue a curative instruction to the jury, the trial court did instruct the State to inform the witness to refrain from making further such statements. Lastly, the Defendant conceded that the evidence was sufficient to support his conviction for assault, and, as we discussed in the previous section, the State presented sufficient evidence to support the Defendant's conviction for kidnapping. The Defendant is not entitled to relief on this issue.

**III. Sentencing.** Lastly, the Defendant asserts that the trial court improperly classified him as a Range II offender based on a prior felony conviction for robbery in Florida. He argues that the Florida conviction does not necessarily equate to a felony conviction in Tennessee because "a Florida crime in which someone could be convicted of taking property merely by unlawful force, is not necessarily equivalent to a Tennessee robbery which requires the taking be accomplished with violence or fear." The State responds that the trial court properly exercised its discretion in sentencing the Defendant as a Range II offender. The State asserts, "[R]obbery is a named felony in Tennessee, as well as in Florida, and this Court has held that a named felony in another state must be considered the equivalent of a named felony in this state for the purposes of determining range." We agree with the State that the trial court properly classified and sentenced the Defendant as a Range II offender.

At the Defendant's sentencing hearing, which was held on August 17, 2018, the State entered the Defendant's presentence report into evidence. The State referenced its pre-trial memorandum on sentencing, which was not included in the record on appeal, and argued that the "Defendant's felony criminal history alone is sufficient to establish extensive criminal history pursuant to the statute to qualify as an enhancing factor." The Defendant argued that he should be classified as a Range I offender. Although the Defendant conceded that his Knox County aggravated assault conviction could be used to determine his range, he asserted that his Broward County, Florida robbery conviction did not amount to a felony conviction in Tennessee, and, therefore, could not be used to qualify him as a Range II offender. The trial court also made the disposition for the Defendant's Florida conviction an exhibit to the hearing. The trial court reasoned as follows in sentencing the Defendant as a Range II offender:

> One of the first analyses which the court must engage in is what is the range of sentence for this offender. In looking at the range calculator, a range one standard offender has zero to one priors. It would appear that he has a class C felony conviction for aggravated assault out of Knox County which is at the same level as this kidnapping conviction. It's undisputed that that qualifies as to a range in the range calculation. The conviction that is at issue is the Florida conviction for robbery. In looking at whether the Defendant could be calculated as a range two multiple offender, it is two to four priors

and a class higher or two down or one prior A if Class A or B. So this is a Class C felony offense. And so by the Court's analysis in looking at range calculation, it would have to be one class higher or two down to qualify. I reviewed the statute as to this robbery conviction out of Florida. And I have considered the argument made by [defense counsel] as to the definition and the differences in the elements of each of the offenses and I agree that that is an analysis that is appropriate for this Court to engage in.

In taking this felony conviction in a light most favorable to the Defendant, in Tennessee the lowest level of felony that this could be is a Class E felony. So if I give the Defendant the benefit of the doubt even though robbery in Tennessee is a class C felony, but under the analysis of maybe a change in elements, at the very least it would be a Class E felony in the state of Tennessee. And under the range calculations, that would make it appropriate in determining whether or not the Defendant is a range two multiple offender. So I have reviewed the statute, I have reviewed the documentation of that conviction out of the State of Florida, and it is this Court's opinion that based upon that analysis of that documentation, coupled with the explanation of Florida law with an analysis of Tennessee law, that it is appropriate at this time for this Court to take into consideration that at the very least this would have been a Class E felony and therefore appropriate in using that to establish that the Defendant is a range two multiple offender. And, therefore, the Court finds him as such.

The trial court sentenced the Defendant as a Range II multiple offender to ten years' imprisonment for kidnapping and eleven months and twenty-nine days for assault, to be served concurrently to each other and consecutively to his Knox County conviction.[5]

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." State v. Brewer, No. W2014-01347-CCA-R3-CD, 2015 WL 4060103, at *7 (Tenn. Crim. App. June 1, 2015) (citing State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012)). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. (citing Bise, 380 S.W.3d at 709-10).

---

[5] Kidnapping is a Class C felony. Tenn. Code Ann. § 39-13-303(b). A Range II sentence for a Class C felony is "not less than six (6) nor more than ten (10) years." Tenn. Code Ann. § 40-35-112(b)(3).

In Tennessee, a multiple offender is a defendant who has received:

(1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable; or

(2) One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

Tenn. Code Ann. § 40-35-106(a). In determining the number of prior convictions a defendant has received:

Prior convictions include convictions under the laws of any other state, government or country that, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

Tenn. Code Ann. § 40-35-106(b)(5).

The Defendant argues that the elements constituting robbery in Florida are not the same as they are in Tennessee.[6] However, according to the statute, "The elements of an offense are to be used when the 'felony from a jurisdiction other than Tennessee is *not a named felony in this state.*'" State v. Webster, No. M2011-00521-CCA-R3-CD, 2012 WL 6032507, at *5 (Tenn. Crim. App. Dec. 5, 2012) (citing Tenn. Code Ann. § 40–35-106(b)(5) (emphasis added in original). In Webster, this Court interpreted the statute and held, "The natural language of Tennessee Code Annotated section 40-35-106(b)(5) leads us to the conclusion that the only time a court should look at the elements of a felony from

---

[6] In Florida, "'Robbery' means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. Ann. § 812.13. In Tennessee, "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. Robbery is a class C felony in Tennessee. Id.

another jurisdiction when determining its appropriate Tennessee classification is when the felony in question is not a named felony in Tennessee." Id. The Defendant was convicted of robbery in Florida, which is a named felony in Tennessee; therefore, we do not need to consider the elements of the statutes. We conclude that the trial court correctly concluded that the Defendant's Florida conviction for robbery could be used to classify him as a Range II offender. He is not entitled to relief on this issue.

## CONCLUSION

Based on the above authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE